equivocal, and that counsel only intended to question the validity of the debt by the claim that the testator intended to forgive it. But the question whether the debt ever had any existence or validity is presented by the pleadings, and nothing was said by counsel in opening foreclosing him from litigating that issue. On the contrary, he then asserted and now reiterates an intention to do so.

Moreover, the defendant, as trustee, was required by the will to pay the plaintiff's testator the income in dispute. Even if the validity of the debt were not disputed, the right of action on it would be in the executor, and the right of the trustee to retain income due the cestui que trust and apply it upon a debt owing the estate by the latter, if it exist, could not be passed upon by the surrogate. The Surrogate's Court has no equitable jurisdiction, and none to pass upon the right of set-off in such a case as this. Stilwell v. Carpenter, 59 N. Y. 414. It thus appears that all the issues between the parties can be determined in one action in the Supreme Court, and that the main, if not the only, issue to be litigated, cannot be determined by the Surrogate's Court.

Under these circumstances we think the Supreme Court should have retained the cause, and the judgment dismissing the complaint should therefore be reversed.

Judgment reversed, and new trial granted; costs to abide the final award of costs. All concur.

---

NEW YORK & L. I. R. CO. v. O'BRIEN et al.

(Supreme Court, Appellate Division, First Department. November 22, 1907.)

1. RAILROADS—CONTROL—STATUTORY PROVISIONS.

Laws 1860, p. 16, c. 10, prohibiting the laying of a railroad in any street of New York City, except under authority and subject to restrictions thereafter granted, wherever the railroad shall commence or end, did not affect the right to construct a railroad on Long Island or under the East river.

2. STATUTES—CONSTRUCTION—STATUTES PARTLY VOID.

Where a part of a statute is unconstitutional, it does not render the remainder void unless all the provisions are so connected that it cannot be presumed that the Legislature would have passed the one without the other.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Statutes, §§ 58–66.]

3. SAME.

Laws 1880, p. 872, c. 582, provided for the construction of underground street railways, but substituted the favorable determination of commissioners when confirmed by the General Term for the consent of the local authorities having control of the street and of the owners of one-half in value of the property bounded on it, as required by Const. art. 3, § 18. Held, that the unconstitutional provision for the substitute may be stricken from the act without affecting the remainder, to which may be applied the constitutional provisions relating to consent.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Statutes, §§ 58–66.]

4. RAILROADS—CONTROL—RIGHT TO CONSTRUCT UNDERGROUND ROAD.

Railroad Law, Laws 1890, p. 1089, c. 565, § 16, which took effect May 1, 1891, embodied the Tunnel Act of 1880 (Laws 1880, p. 872, c. 582), and

corrected the unconstitutional feature thereof, allowing a substitute for the consent of the local authorities, but it made the provisions applicable only to corporations thereafter incorporated. Laws 1890, p. 1134, c. 565, § 181, provided that the repeal by it of prior laws specified, including the act of 1880, should affect no right acquired prior to May 1, 1891. Section 16 was amended by Laws 1892, p. 1450, c. 702, and made retroactive, so as to include corporations organized under Laws 1850, p. 211, c. 140, and amendatory and supplemental acts and to conform with the act of 1880. *Held*, that an ordinance adopted December 31, 1890, permitting the construction of a tunnel under New York City streets, was valid.

**5. SAME—LOCATION OF ROAD—TERMINI—STATUTORY PROVISIONS.**

The provision in Laws 1850, p. 211, c. 140, that the certificate of incorporation of a railroad should state the places from which and to which the road is to be constructed, is satisfied by naming the towns, villages, or cities which are the termini of the road.

**6. STREET RAILROADS—STATUTES—CONSTRUCTION.**

An underground tunnel railroad with a large portion of its route beneath East river, and much of it built on private property, is not a street railway within Laws 1886, p. 919, c. 642, re-enacted in Laws 1890, pp. 1108, 1109, c. 565, §§ 91, 92, 93, relating to street surface railroads.

**7. RAILROADS—CHARTER FORFEITURE BY LAPSE OF TIME.**

Laws 1850, p. 211, c. 140, as amended by Laws 1867, p. 1903, c. 775, provide that the corporate existence of a railroad shall cease, if it shall not within 5 years after having filed its articles begin to construct its road and expend 10 per cent. of its capital, or shall not finish its road and put it in operation within 10 years. *Held*, that, where articles were filed July 30, 1887, and 10 per cent. of the capital was expended by July 30, 1892, and the time for completion was extended by various acts to January 1, 1907, the company had not forfeited its corporate rights by lapse of time in June, 1906.

**8. SAME—RIGHT OF WAY—GRANT OF RIGHTS IN LAND—ESTOPPEL TO REVOKE.**

Laws 1870, p. 390, c. 137, § 99, as amended by Laws 1871, p. 1242, c. 574, § 6, subd. 10, provided for the conveyance to New York City of certain land under water to be used for docks, etc., which was afterwards made. Subdivision 2 and subsequent acts give the department of docks exclusive control of all wharf property belonging to the city. *Held*, that the title being in the city, and it having power to convey it in so far as it was not needed for docks, etc., permits given by the board of aldermen to a railroad to construct a tunnel under the land at a depth of 75 feet below tidewater, the use being one which would not interfere with the use of the land for commerce, could not be revoked, after the railroad had acted on them and expended a large sum of money in constructing the tunnel, on the ground that the dock department's permission had not been obtained.

Appeal from Special Term, Queens County.

Action by the New York & Long Island Railroad Company against John H. O'Brien, as Fire Commissioner, and others. From a judgment granting a permanent injunction, defendants appeal. Affirmed. See 100 N. Y. Supp. 316.

Argued before PATTERSON, P. J., and INGRAHAM, LAUGHLIN, CLARKE, and HOUGHTON, JJ.

Terence Farley and Francis K. Pendleton (Theodore Connoly, of counsel), for appellants.

George W. Wickersham and Strong & Cadwalader (Morgan J. O'Brien, of counsel), for respondent.

CLARKE, J.  The New York & Long Island Railroad Company, a corporation organized in 1887 for the purpose of constructing and operating a railroad from Long Island City, in the county of Queens, by a tunnel under the East river to New York City, in the county of New York, entered into a contract with the Degnon Contracting Company for the construction of its tunnel.  Said contractor in August, 1905, upon giving four several bonds in the sum of $5,000 each, obtained from the fire commissioner of the city of New York four several licenses to use and keep explosives to be used in the prosecution of said work in conformity with the ordinance to regulate the sale, use, and transportation of explosives in the city of New York, adopted May 15, 1902, and approved by the mayor of said city May 19, 1902.  In October and November, 1905, the superintendent of buildings of the borough of Manhattan issued to said Degnon Contracting Company four certain permits for temporary buildings to be used in connection with the construction of plaintiff's railroad and tunnel.  On the 22d day of January, 1906, the inspector of combustibles of the fire department of the city of New York delivered to the Degnon Contracting Company a letter, stating:

"By direction of the corporation counsel, your permits have this day been revoked and you will discontinue all blasting operations and cause to be removed from your various magazines in Long Island City, Man-of-War Man's Reef, 42nd. street east of 1st avenue and 42d street west of 3rd avenue, all explosive material."

The ordinance alluded to provided that:

"The said fire commissioner shall have power to revoke the license or licenses in case in his judgment there is an infraction of this ordinance or of the regulations of the municipal explosives commission."

No infraction of said provisions was proved, nor was it claimed or alleged on behalf of the individual defendants or on behalf of the city of New York that there had been any such infraction.  On the 24th of January, 1906, the superintendent of buildings of the borough of Manhattan wrote to the Degnon Contracting Company:

"In accordance with the request of the mayor, based on the opinion of the corporation counsel, I hereby revoke the following permits [enumerating them]:  For temporary buildings to be used in connection with the construction of the Long Island Railroad tunnel under 42d street, for the reason that the right to build this tunnel is disputed."

Thereafter the plaintiff brought this action to enjoin and restrain the defendants from in any respect molesting or interfering with the plaintiff or the said Degnon Contracting Company in the construction of plaintiff's tunnel and railroad, or in the use and keeping of combustibles in connection therewith, or in the maintenance of such buildings and structures pursuant to the permits theretofore issued for that purpose, and from revoking or attempting to revoke or set aside said licenses or permits or any of them.  It obtained an injunction pendente lite and a judgment upon the trial at Special Term making such injunction permanent, from which judgment the defendants here appeal.

The individual defendants are administrative officers of the city. In the performance of their administrative functions, upon due appli-

cation and in strict conformity to the provisions of law, they issued to a contracting company certain permits necessary to it for the prosecution of the work which the company had under construction. Said administrative officers, not of their own motion, not in the exercise of their judgment as such administrative officers, and not for any infraction of the rules or regulations governing the issuance and continuance of such permits, undertook to revoke them upon direction of the mayor, upon the grounds, as was sought to be established upon the trial, first, that the New York & Long Island Railroad Company was not a legal corporation; and, second, that it had no right to construct its tunnel upon which it had expended a very large amount of money. On the 22d of July, 1887, Walter S. Gurney and others duly made and acknowledged certain articles of association pursuant to the act entitled, "An act to authorize the formation of railroad corporations and to regulate the same, passed April 2, 1850" (Laws 1850, p. 211, c. 140), and the acts amendatory thereof and supplementary thereto, which said certificate was duly filed and recorded in the office of the Secretary of State on the 30th day of July, 1887. The articles provided that the company was to continue in existence for 99 years; that the places from and to which said railroad was to be maintained and operated were as follows:

"Commencing in Long Island City, Queens county, N. Y., at a point on or near the line of Borden avenue and distant about one mile from the East river; thence partly underground and partly in cutting to the East river; thence under the East river by means of a tunnel, and under streets and lands in the city of New York, county of New York, to a connection with the New York Central & Hudson River Railroad, at the corner or at a point near the Ninth avenue and 30th street; with a branch on the north to a connection with the New York Central & Hudson River Railroad, at or near the Grand Central Depot, in said city of New York, and a branch southerly to connect with what is now known as the Hudson river tunnel in the vicinity of Washington Square in said city of New York. The length of said railroad, as nearly as may be estimated, is five (5) miles, and the same is intended to be constructed within said counties of Queens and New York. The amount of capital stock of said railroad company shall be $100,000 consisting of one thousand shares of one hundred dollars each."

The appellants claim that in 1887, at the time of the filing of these articles of association, the building of such an underground road was prohibited by law, and that, as the corporation was organized for an illegal purpose, it never had a legal inception, and was not and is not a legal corporation and therefore has no power to sue.

It is true that chapter 10, p. 16, Laws 1860, provided that:

"It shall not be lawful hereafter to lay, construct or operate any railroad in, upon or along any or either of the streets or avenues of the city of New York, wherever such railroad shall commence or end, except under the authority and subject to the regulations and restrictions which the Legislature may hereafter grant and provide."

It is conceded, as it must be, that although this railroad was not exclusively at the time of its incorporation a New York City road, nor in the ordinary meaning of the words a street railroad at all, yet, as the statute affected a railroad in, upon or along some of the streets of the city of New York wherever it should commence or end, that, if there did not exist legislation subsequent to the act of 1860 which

authorized the construction of this road, it could not have been lawfully built "in, upon, or along" any street in the city of New York. People ex rel. N. Y. City & Westchester R. R. v. Commissioners, 81 App. Div. 237, 81 N. Y. Supp. 26, affirmed 176 N. Y. 577, 68 N. E. 1123; People ex rel. New York Central & Hudson R. R. v. Mayor, 81 App. Div. 242, 81 N. Y. Supp. 20, affirmed 175 N. Y. 516, 67 N. E. 1088; Matter of N. Y. District Railway, 107 N. Y. 42, 14 N. E. 187; Matter of Washington Street A. & P. R. R., 115 N. Y. 442, 22 N. E. 356. The prohibition contained in the act of 1860 applied only to so much of the railroad as was to be built "in, upon or along any or either of the streets or avenues of the city of New York," and did not affect the right of the railroad corporation to build or operate its road in Queen's county or under the East river. It could have constructed its road to the exterior bulkhead line of the city of New York on the East river, and then under private property in the city of New York without coming within this prohibition. The Legislature did pass thereafter the so-called "tunnel act" (chapter 582, p. 872, Laws 1880), entitled:

"An act to provide for excavating and tunnelling and bridging for transportation purposes within villages and cities of this state."

Section 1 of this act provided:

"Whenever according to the route and plans adopted by any railroad company heretofore or hereafter formed under any special act of the Legislature of this state, or under chapter 140 of the laws of 1850, entitled: 'An act to authorize the formation of railroad corporations and to regulate the same' and all acts supplementary thereto or amendatory thereof for the building of its railroad, it shall be necessary or proper to build said road, or any part of the same underground, or to tunnel or bridge any river or waters, it shall be lawful for said company to enter upon and acquire title to and use such lands under water and uplands, except on or along any canals owned by the state, as shall be necessary for purposes herein mentioned, and they shall have the power to construct, erect and secure the necessary foundations and other structures which may be required for the operating of such road or connecting the same with another, and for maintaining the same * * * and provided, further, that whenever such road, or any part of the same, is intended to be built within the limits of any city or incorporated village of this state and to run by means of a tunnel underneath any of the streets, roads or public places thereof, the said company, before building the same underneath any of said streets, roads or public places, shall obtain the consent of the owners of one-half in value of the property bounded on the line * * * and of the proper authorities having control of said streets, roads or public places. * * * "

The appellants claim that this act was unconstitutional. In Matter of New York District Railway Co., 42 Hun, 621, Id., 107 N. Y. 42, 14 N. E. 187, it appeared that the New York District Railway Company had been incorporated under the act of 1850 for the purpose of constructing a tunnel railroad wholly within the then city of New York, and, having failed to secure the consents of either the local authorities of that city or of the owners of the property abutting on the streets through which it proposed to build its road, applied to the General Term of the Supreme Court for the appointment of commissioners, whose report, confirmed by the General Term, was by the terms of the act of 1880 made a substitute for both the consents of

the local authorities and of the property owners. It was held that so much of said act as substituted the favorable determination of the commissioners when confirmed by the General Term for the consent of both the local authorities and the property owners was unconstitutional. Mr. Justice Barrett, in writing the opinion of the General Term, said:

"Having thus concluded that the act of 1880, in the particulars discussed, is unconstitutional, I do not think that the petitioner's case is within the principle that, when part of an act is constitutional and part unconstitutional, that part which is valid should be upheld, provided it is separable from that which is invalid. This principle would enable the petitioner to proceed under the act up to the point where an application for the appointment of commissioners is essential. It may obtain the consent of the local authorities and of the requisite number of property owners. These provisions are valid and separable from what follows; but, when an application for the appointment of commissioners becomes necessary, the petitioner must take the provision on that head as it is. The court cannot sever the effect which the act gives to the confirmation of the commissioners' judgment. We cannot say that there shall be a constitutional effect when the act declares there shall be an unconstitutional one. * * * The act does not substitute the confirmation of the commissioners' judgment for the consent either of the local authorities or of the property owners, but for that of both."

And the Court of Appeals, Judge Finch writing for a unanimous court, expressed the same views. He said he could not see his way clear to adopt the conclusion that only so much of the act of 1880 was invalid as made the order of the court confirming the report of the commissioners stand for the consent of the authorities, and that the order might be granted and stand for the consent of the property owners alone, and concluded:

"It is not the case of two independent provisions, one of which may be rejected without affecting the remainder of the act, for we cannot lessen the effect of the order without maiming the order itself and its statutory character. Very possibly the act may stand as an authority for the construction of an underground street railway upon the condition of the assent of the city authorities and the half of abutting values, and rejecting all the provisions for the appointment of commissioners, whose order shall be a substitute. Further than that we do not deem it our duty to go."

This is a clear recognition of that principle of statutory construction as stated by Judge Cooley in Constitutional Limitations (7th Ed.) p. 246:

"Where, therefore, a part of a statute is unconstitutional, that fact does not authorize the court to declare the remainder void also unless all the provisions are connected with the subject-matter, depending on each other, operating together for the same purpose, or otherwise so connected in meaning that it cannot be presumed the Legislature would have passed the one without the other."

The constitutional provision is contained in article 3, § 18, as follows:

"No law shall authorize the construction or operation of a street railroad except upon condition that the consent of the owners of one-half in value of the property bounded on and the consent also of the local authorities having control of that portion of a street or highway upon which it is proposed to construct or operate such railroad shall be first obtained. * * *"

This provision of the Constitution is complete in itself. Recognizing the serious effect of a street railroad upon adjacent property, and

also upon the city, by the conferring of what from its nature must be an exclusive franchise it prohibited such construction without the consent of one-half of the owners of property and the local authorities. What was intended to be obtained and what was regarded as essential was the consent of the public authorities and of private persons interested. Realizing, however, that a great public improvement might be blocked or frustrated by selfish private interests, it provided, in the alternative, that for the consent of the necessary number of property owners should be that of commissioners appointed by the court when confirmed by the court. It seems to be quite apparent that an improper provision providing a substitute for the consent of the local authorities can be stricken from the act as unconstitutional, without in any way affecting the remainder of its provisions to which can be applied the constitutional provisions of consent. It seems to me, therefore, that in 1887, when this corporation was formed under the act of 1850 and the acts amendatory thereof and supplementary thereto, there was valid and existing law under and in conformity with which it had a right to construct and operate the road contemplated by it, and therefore, that it was then a legal corporation organized for legal purposes.

On the 3d of December the board of aldermen of the city of New York passed, and on the 31st of December, 1890, the mayor approved, an ordinance assenting to the—

"construction of a double-track railroad by the New York & Long Island Railroad Company in, by and through a tunnel beneath the surface of 42nd street, from its easterly end to a point therein between 10th and 11th avenues, in said city, with such connections, branches, turnouts, sidings and switches, as may be requisite and necessary, in accordance with the plans and profiles of such railroad heretofore deposited with this board, or such modification thereof as shall be approved by the commissioner of public works of such city."

The ordinance also provided that:

"The company shall pay annually to the city of New York three per centum of its gross earnings or receipts from transportation of persons and property of all taxes levied by and payable to the city of New York on the real or personal property, capital stock or income of said company."

The Legislature, in the general scheme of modification and revision of the statutes, passed the railroad law (chapter 565, p. 1082, Laws 1890), which became a law June 7, 1890, to take effect, however, May 1, 1891. Section 16 of that act embodied the provisions of the tunnel act of 1880 and corrected the unconstitutional feature passed upon in the District Railway Case, supra. This section, as thus passed, provided that, "when according to the route and plan adopted by any railway corporation hereafter incorporated for the building of its road, * * *" etc., thus making the provisions applicable only to corporations thereafter incorporated. This provision could not have impaired the validity of the consent granted to plaintiff by the city of New York in December, 1890, for section 181 of the act expressly provides "that no repeal by it of any prior law specified in the schedule annexed," which included the tunnel act of 1880, "should affect or impair any right accruing, accrued or acquired * * * prior to May 1st, 1891." Further, the mistake in the language of the act of

1890 was corrected by chapter 702, p. 1450, Laws 1892, which spe-cifically amended section 16 of the railroad law so as to read:

"When according to the route and plan for the building of its road adopt-ed by any railroad corporation, including corporations organized under chapter 140 of the Laws of 1850, and the acts amendatory thereof and supplementary thereto, it shall be necessary or proper to build it or any part of it under-ground or to tunnel * * * any river or waters. * * *"

This provision was necessarily retroactive, for the act of 1850 had been repealed by the railroad law of 1890, and, furthermore, the ob-vious purpose of the act in this regard was to make section 16 of the act of 1890 conform to the provisions of the act of 1880, which it was intended to re-enact in the General Laws. The consent of the local authorities of the city of New York was therefore authorized by law at the time it was given by the ordinance alluded to. The consent of the local authorities of the city of Long Island City was given by ordinances passed by the board of aldermen on the 20th of October, and approved by the mayor on the 27th of October, 1891, and sub-sequently the plaintiff duly obtained the necessary consents of the owners of the property bounded on the streets of its proposed route both in New York and Long Island Cities.

The appellant contends that the consents of the local authorities were ineffectual because the route consented to in said ordinances is not the route expressed in the certificate of incorporation. The act of 1850 provided that the certificate should state the places from which and to which the road is to be constructed or maintained and operated. In my opinion the word "places" in the act was merely for the purpose of fixing the termini by naming the towns, villages, or cities from and to which the road should run, and that, the certificate having stated that the road was to commence in Long Island City, Queens county, and extend to New York City, New York County, the rest of the de-scription of the termini and route was surplusage, unnecessary to the validity of the certificate and unimportant in fixing the actual route of construction. The statutes requiring the consents of the property own-ers and of the local authorities required those consents to be obtained before construction. After the local authorities of the city of New York had given their assent to the construction upon a prescribed route, the board of directors, by a vote of two-thirds thereof, resolved to alter and change the route and profile of its map in the then city and county of New York so as to conform to the route authorized by the aforesaid ordinance of said city, and on August 13, 1891, it duly made and filed the certificate of such change in the clerk's office of said county. This in accordance with section 13, c. 565, p. 1088, Laws 1890, providing as follows:

"Every domestic railroad corporation may, by a vote of two-thirds of all its directors, alter or change the route or any part of the route of its road or its termini, or locate such route or any part thereof, or its termini, in a county adjoining any county named in its certificate of incorporation, if it shall appear to them that the line can be improved thereby, upon making and filing in the Clerk's office of the proper county, a survey, map and certificate of such alteration or change; * * * but neither terminus can be changed, under this section, to any other county than one adjoining that in which it was previously located. * * * Any railroad corporation may by a vote

of its directors change the grade of any part of its road, except in the city of Buffalo, in such manner as it may deem necessary, to avoid accidents and to facilitate the use of such road. * * * No portion of the track of any railroad, as described in its certificate of incorporation, shall be abandoned under this section."

It also duly filed resolutions and maps required in Long Island City. Subsequently, and in 1905, the directors, pursuant to the provisions of the same section, took proceedings to change the grade of its road in each of the boroughs of Manhattan and Queens, with the formal approval of the presidents of these boroughs, and the requisite maps, profiles, and certificates of the alteration of such lines were filed in the clerk's office of each of the said counties.

The appellants claim that the provisions of the Cantor act (chapter 642, p. 919, Laws 1886), providing that the local authorities cannot give their consent to the construction, maintenance, use, operation, or extension of a street railroad except upon the condition that the right, franchise, and privilege of using such street, road, avenue, park, or public place shall be sold at auction to the bidder who will agree to give the largest percentage per annum of the gross receipts of said company or corporation to the city, apply, and that, as concededly no such condition was attached to the consents of the local authorities of Long Island and New York Cities, the said consents were illegal, void, and of no effect. The Cantor act was repealed by chapter 565, p. 1082, Laws 1890, but analogous provisions were re-enacted in sections 91, 92, and 93 of said act, where they appear in article 4 under the heading, "Street Surface Railroads." Section 90 of the article provides:

"The provisions of this article shall apply to every corporation which under the provisions thereof or of any other law has constructed or commenced operating or extending a street surface railroad * * * for public use in the conveyance of persons and property in cars for compensation, upon and along any street, avenue, road, highway or public property, in any city, town or village, or in any two or more civil divisions of the state, and every such corporation must comply with the provisions of this article."

Whatever else this road may be, it is not a street surface railroad. It is an underground tunnel road; a large portion of its route being beneath the East river, and it having been required to purchase a considerable amount of private property. It does not seem to come within the language nor within the intent of the statute referred to.

The appellants claim that the plaintiff has forfeited its rights by lapse of time. By amendment to the railroad law of 1850, made by chapter 775, p. 1903, Laws 1867, it was provided that the corporate existence and powers of the company should cease if it should not within five years after the filing of its articles of association begin the construction of its road and expend thereon 10 per cent. of its capital, or should not finish its road and put it in operation within 10 years from said time. The articles of association were filed on the 30th of July, 1887. The company entered into a contract for the construction of its road in June, 1890. Work was begun thereunder, and by July 30, 1892, upwards of 10 per cent. of the capital had been expended. The time for completion had been extended by chapter 700, p. 468, Laws 1895, chapter 647, p. 1430, Laws 1899, chapter 487, p. 1142, Laws

1902, and chapter 597, p. 1282, Laws 1903, to January 1, 1907. As this case was commenced in February, 1906, and tried in June of the same year, the time limit for completion had not expired.

The further claim is made that the plaintiff never obtained the consent of the department of docks to cross a 300-foot strip of land under water which was granted to the city pursuant to chapter 137, p. 366, Laws 1870, as amended by chapter 574, p. 1231, Laws 1871. Section 99, c. 137, p. 390, Laws 1870, as amended by subdivision 10, § 6, c. 574, p. 1242, Laws 1871, provided that:

"The commissioners of the land office are hereby authorized to convey by proper instruments in writing necessary for the purpose, all the property, right, title and interest of the people of the state of New York in and to the land under water used and taken by said board for the construction of wharfs, docks, piers, bulkheads, basins and slips under this act, wherever said commissioners may be required by said board to make such conveyance to the mayor, aldermen and commonalty of the city of New York."

The board of commissioners of the department of docks did require in writing the land commissioners to convey and a patent was issued September 28, 1871, of "all the property, right, title and interest of the people of the state of New York in the land covered by water lying within and westerly of an exterior line beginning at the intersection of the west line of the west pier of the Staten Island Ferry, East river * * * thence around Corlears Hook to foot of Grand street * * * three hundred feet outside of the pierhead line established by chapter 763, of the Laws of 1857, and parallel therewith until said line intersects the prolongation of the south line of East Sixty-Fifth street * * *," which includes the locus in quo. On January 5, 1891, a patent was issued giving and granting unto the New York & Long Island Railroad Company, its successors and assigns, a right of way 99 feet in width and 50 feet in height within which to construct a tunnel for the use and operation of the above-named parties' railroad beneath the waters of the East river, "upon and along the route of said railroad between the city of New York and Hunter's Point in Long Island City * * * together with all and singular the rights, hereditaments and appurtenances to the same belonging or in any wise appertaining." On the 28th of June, 1905, the plaintiff obtained permission from the War Department for the construction of its tunnel and to sink two vertical shafts on the southerly end of Blackwell's Island, or Man of War Reef, and to erect there necessary staging not exceeding 100 feet in width and 400 feet in length, and on July 8, 1905, upon payment of $5,000, obtained from the land office of the state of New York, permission to sink said shafts on Man of War Reef. The corporation counsel advised the Attorney General, upon said application to the land office, that:

"So far as the city of New York is concerned, there is no objection to the issuance by the commissioners of the land office of a permit to such a shaft as requested by said railroad company."

So that it appears that at various times since the organization of this company and the inception of its work it has received recognition and consents from the national and state governments, from the local authorities of Long Island City and New York City, and from one-

half of the property owners abutting upon its line. Notwithstanding these facts, and the investment of capital and the expenditure of large sums of money in the prosecution of the enterprise so recognized and consented to, the city now claims that, by reason of the grant in 1871 of the 300-foot strip of land under water, there is an absolute bar to the right of the company to connect its line under the East river with its tunnel in the borough of Manhattan, and that no power is lodged anywhere in any city board or authorities to permit it. Carried to its logical conclusions, this contention, if sound, isolates the island of Manhattan absolutely from New Jersey and from Long Island by way of underground approach, and affects all the tunnels finished, building, or proposed. A grant to the city to facilitate commerce, to develop its resources and encourage the solution of its transportation problems, made in 1871, is to create a far worse obstacle than the rivers which surround the city, for they may be bridged—although it would seem, if the city's position is right, that even abutments and piers for bridges could not be placed upon the land included within this grant—and deny to the public for all time any development along the great lines of tunnel improvement which has marked the progressive efforts of the last decade to reduce the isolation of the city and cheapen the ways of approach to it. Such a construction is not to be adopted unless it is the only one possible. The act of 1871 empowered the commissioners of the land office to convey to the city the interest of the people in and to land under water used and taken by the dock board "for the construction of wharves, docks, piers, bulkheads, basins, and slips under this act." The grant conveys "unto the mayor, aldermen and commonalty of the city of New York all the property, right, title and interest of the people of this state in and to the land under water," etc. Subdivision 2, § 6, c. 574, p. 1235, Laws 1871, provides that the department of docks shall have exclusive charge and control of all the wharf property belonging to the city, including all the wharves, piers, bulkheads, and structures thereon and waters adjacent thereto, and all the slips, basins, docks, water fronts, lands under water and structures thereon, and the appurtenances, easements, uses, reversions, and rights belonging thereto or to which said corporation is or may become entitled, or which said corporation may acquire under the provisions hereof or otherwise. This control was continued by the consolidation act (Laws 1882, p. 199, c. 410, § 711), the charter of 1897 (Laws 1897, p. 291, c. 378, § 818), and the revised charter (Laws 1901, p. 346, c. 466, § 818). Title is in the city; jurisdiction to regulate and control in the dock department for the purpose for which such jurisdiction is vested, namely, promotion and regulation of the commerce of the port; and no use that the plaintiff will make of the property conveyed to the city of New York by this grant can interfere with the use of the property for the promotion and regulation of commerce. Whether the consent of the board of aldermen heretofore given is sufficient authority for the construction of this tunnel through this narrow strip of land under water at a depth of 75 feet below high water need not now be determined. That consent was given by the governing board of this city. The city held the title to the property

in its corporate capacity, and, so far as the property was not needed
for docks, basins, or slips, it seems the city has the same rights over
it as over any other of its land. If it purchased land for a courthouse
or a police station, and in time such structure was not needed upon
that site, the land would still be held by the city in its proprietary ca-
pacity and subject to its disposal. The block on the Fifth avenue be-
tween Fortieth and Forty-Second streets, formerly the site of a reser-
voir, has been recently appropriated for another public use, namely, a
public library.

Chapter 789, p. 1687, Laws 1895, authorizing the construction of
the new East River Bridge, provided in section 4:

"The said commissioners are also authorized to acquire so much of the
land under water, or otherwise, of the East river as may be necessary for
the construction of piers and towers of the bridge hereby authorized to be con-
structed. * * * The commissioners of the land office of the state of New
York are hereby authorized to convey to said city such land under water
that may be necessary for the construction of said bridge as may still remain
the property of the state."

By chapter 338, p. 693, Laws 1892, the East River Gas Company
of Long Island City was empowered "to lay and maintain conductors,
mains and pipes under and across the East river and across any inter-
vening land belonging to the city of New York or to private persons,"
and also "to acquire by condemnation or purchase such real prop-
erty, public or private, or right or interest therein, for the laying and
maintaining of its mains, pipes and conductors as may be necessary
for the exercise of the powers hereby conferred." In pursuance of
that authority, the said company was engaged in constructing a tun-
nel between the foot of One Hundred and Tenth street, Manhattan, to
Astoria, Long Island, and therefore through lands under water con-
veyed to the city by the state under the patent hereinbefore referred to.
It instituted condemnation proceedings to secure easements and rights
of way against the city and the state of New York, and the report of
said commissioners was before this court and was confirmed in 119
App. Div. 350, 104 N. Y. Supp. 239. The said tunnel, although at
an average depth below tidewater of 208 feet, upon the city's conten-
tion here, is as much an invasion of the city's rights as the tunnel in
the case at bar, which is 75 feet below tidewater. No such question
was raised, and the report of the commissioners and their award for
the easements granted was confirmed.

The contention of the city that the grant of additional property and
rights to it, instead of facilitating the growth and expansion of its com-
mercial and transportation facilities, has been to contract them within
adamantine bands which no power can pierce, is so unreasonable as to
demonstrate its unsoundness.

For the purposes of this suit, it is unnecessary to decide where the
power is lodged. The permits at bar were not revoked because the
permission of the dock department had not been granted to pierce
the strip of land under water. We have seen that the corporation was
duly organized and legally existing; that it had the necessary permits
to enter upon the construction of its tunnel; that, when issued, the
said permits were issued in accordance with law; and that their rev-

ocation was arbitrary and based upon no violation of the rules and regulations governing the subject. Some of the questions that were here raised, and some others that might be suggested, do not properly belong in this suit. If the company is a trespasser, or if it has forfeited its franchise by matters arising since the commencement of this action and which are not before us, there are appropriate remedies. We have to deal with what is properly before us; that is, the attempted revocation of the permits which this action was brought to restrain.

The judgment appealed from should be affirmed, with costs. All concur.